**FOR PUBLICATION**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| IN RE: | ) |
| | ) |
| THOMAS VAUGHAN RHODES, | ) CASE NO. 07-21721 (ASD) |
| | ) |
| DEBTOR | ) CHAPTER 7 |
| | ) |
| THOMAS VAUGHAN RHODES, | ) |
| | ) |
| PLAINTIFF | ) |
| | ) |
| v. | ) ADV. PRO. NO. 08-2016 |
| | ) |
| CONNECTICUT STUDENT LOAN | ) Re: DOC. I.D. NO. 1 |
| FOUNDATION and EDUCATIONAL | ) |
| CREDIT MANAGEMENT CORP., | ) |
| | ) |
| DEFENDANTS | ) |

APPEARANCES:

William R. Broneill, Esq.
Law Offices of William R. Broneill
178 East Center Street, Manchester, CT 06040
Counsel for Plaintiff-Debtor

R. Richard Croce, Esq.
Connecticut Student Load Foundation
525 Brook Street, P.O. Box 1009, Rocky Hill, CT 06067
Counsel for Defendant Connecticut Student Load Foundation

Stephen R. Klaffky, Esq.
Brown Rudnick Berlack Israels LLP
CityPlace I, 185 Asylum Avenue, 38th Floor, Hartford, CT 06103
Counsel for Defendant Educational Credit Management Corp.

### MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE
### DISCHARGEABILITY OF EDUCATIONAL DEBT

DABROWSKI, ALBERT S., Chief United States Bankruptcy Judge

## I. INTRODUCTION

In the captioned adversary proceeding the Debtor seeks a determination that certain student loans are dischargeable as imposing an "undue hardship" as that term is used in Bankruptcy Code § 523(a)(8). For the reasons set forth hereinafter, the Court concludes that the relevant student loan debts are nondischargeable.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this proceeding on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1) and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(I).

## III. PROCEDURAL BACKGROUND

Thomas Vaughan Rhodes (heretofore and hereafter, the "Debtor"), on November 29, 2007 (hereafter, the "Petition Date"), commenced the above-captioned bankruptcy case by the filing of a voluntary petition under Chapter 7 of the Bankruptcy Code. The Chapter 7 trustee determined that the Debtor had no assets for distribution to creditors and the Debtor, on March 11, 2008, was granted a discharge.

The Debtor, on March 3, 2008, initiated the instant adversary proceeding through the filing of a Complaint to Determine the Dischargeability of Debt (hereafter, the "Complaint") in which the Debtor requested a determination of "dischargeability" related to student loans held by Connecticut Student Loan Foundation (hereafter, "CSLF") and Educational Credit

2

Management Corp. (hereafter, "ECMC") (hereafter, collectively, the "Defendants") on grounds that repayment would impose an "undue hardship," pursuant to Section 523(a)(8).[1] On the Petition Date the Debtor scheduled debts to CSLF and USAF[2] totaling approximately $27,849.97.[3]

On January 5, 2009, after due notice, a trial on the Complaint was conducted (hereafter, the "Hearing"), at which time the Court heard the testimony of the Debtor and received documentary evidence. Following the Hearing, the parties filed memoranda of law in support of their respective positions.

## IV. FACTUAL BACKGROUND

### A.    The Debtor's Educational Background and Employment History.

The Debtor received his Connecticut high school equivalency diploma in 1970. Thereafter, he was drafted into the United States Army where he served on active duty status from 1971 to 1973, stationed in Oklahoma.[4]

From 1974 to 1984 the Debtor was employed in various positions "on and off" by M.H. Rhodes, Inc., a business started by his grandfather and partly owned by his father that manufactured parking meters and other timing devices. The Debtor left the company in 1984 following a disagreement with his father. After his father's death, M.H. Rhodes,

---

[1] Fed. R. Bankr. P. 4007(a) provides that "[a] debtor or any creditor may file a complaint to obtain a determination of the dischargeability of any debt." Rule 4007(b) provides, inter alia, " [a] complaint other than under § 523(c) [referencing §§ 523(a)(2), (4) and (6)] may be filed at any time."

[2] The Defendant, ECMC was substituted as Defendant in place of Defendant United Student Aid Funds, Inc. ("USAF") to reflect the assignment of its interest in the subject loans to ECMC.

[3] The parties stipulated that as of the date of the Hearing, the indebtedness to CLSF was $9,701.94, and the indebtedness to ECMC was $21,813.06 (totaling, $31,515.00).

[4] Upon his release from active duty status, the Debtor remained on reserve status until 1977.

3

Inc. was sold and the Debtor, in 1986, received an inheritance of approximately $200,000.00. From 1986 to 1993, the Debtor earned no income; he used the inheritance and the interest thereon to pay his living expenses, to travel, and to start two businesses - one selling vitamins and another involved in trading securities. Both of these businesses failed and, by 1993, none of the inheritance remained.

From June, 1993 to June, 1994, the Debtor lived at a Veteran's Home and was employed, at minimum wage, by the Veteran's Hospital as an orderly. After leaving the Veteran's Home, the Debtor began taking classes at Naugatuck Valley Community College (hereafter, "Naugatuck") and applied for admission, but was not accepted, to its paramedic certificate program. The Debtor then transferred to Capital Community College (hereafter, "Capital") and, in 1996, was admitted to Capital's paramedic program. The Debtor was terminated from that program as a result of his repeated refusal to remove clip-on sunglasses during class. Thereafter, the Debtor enrolled at the University of Connecticut (hereafter, "UConn") and, in May, 1999, at the age of 47, received a Bachelor of Arts degree in philosophy.

Following graduation from UConn, the Debtor applied to and was accepted into the Peace Corps for a two-year term beginning in July, 2000. He was sent to the Cape Verde Islands but was terminated and returned to Connecticut after only one month. His termination from the Peace Corps resulted from a "confrontation" with a security officer.

Upon returning to Connecticut, the Debtor was employed intermittently, with short stints as a machine screw operator, house painter, and parking lot attendant, and for longer periods handling freight for two air cargo companies, and Federal Express. From May, 2006 to the present, the Debtor has been employed by Macy's department store,

4

checking the security of their deliveries and shipments and logging relevant data into the company's computer system. He presently works a set schedule of 30 hours per week, on Friday through Sunday nights. The Debtor testified that he is willing and able to work additional hours, but is not permitted to do so because of complaints he had made against management and coworkers. (Tr. at 150 (Debtor stated, "It's just punitive. I made a stink."))

The Debtor's Schedules I (Income) and J (Expenses) indicate the following, on a monthly basis:

Schedule I (Income):

```
Monthly Gross Income  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,359.15
Less Payroll Deductions
     Payroll Taxes and Social Security  . 196.91
     401(k) Plan  . . . . . . . . . . . . . . . . . . . 130.30
     Total Payroll Deductions  . . . . . . . . . . . . . . . . . . . . . . . . . .  327.21
Monthly Take Home Income . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,031.94
```

Schedule J (Expenses):

```
Rent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 370.00
Telephone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41.00
Food . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230.00
Clothing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25.00
Laundry and Dry Cleaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25.00
Transportation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250.00
Auto Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75.00
Total Monthly Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,016.00

Take Home Income minus Expenses    . . . . . . . . . . . . . . . . . . . . $15.94
(hereafter, the "Monthly Cushion").
```

At trial, the Debtor testified that the 401(k) contribution amount shown in Schedule I was in error and that the correct amount is equal to three percent of gross income, which was $40.77. Making this correction increases his monthly take home pay to $1,121.47.

The Debtor also testified that the $250.00 shown in Schedule J for transportation

5

expense was based upon I.R.S. guidelines; he estimated his actual transportation expenses to be about \$175.00. In addition, the Debtor presented evidence that, as of September 1, 2008, his rent increased by \$10.00 to \$380.00 per month. Making these adjustments decreases his monthly expenses to \$951.00. The combined effect of these adjustments results in a Monthly Cushion of \$170.47 (\$1,121.47 - \$951.00 = \$170.47).

## B.   *The Student Loans*

As a veteran, the Debtor received a full tuition waiver at both Naugatuck and Capital community colleges and at UConn. He used the proceeds from his student loans to pay his living expenses. The parties have stipulated that the outstanding balances due each of the Defendants as of the date of trial were:

Outstanding Debt to CSLF (incurred in 1996; at Capital) . . . . . . \$9,701.94
Outstanding Debt to ECMC (incurred in 1998; at UConn) . . . . \$21,813.06
Total Student Loan Debt as of January 6, 2009  . . . . . . . . . . . \$31,515.00

The parties have also stipulated that the Debtor applied for and was granted several deferrals over the period from the time of his graduation until September, 2004 and that the Debtor has made no voluntary payments towards the student loans.[5]

## V.   DISCUSSION

Section 523(a)(8) of the Bankruptcy Code provides that a debt for student loans is not discharged "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. §523(a)(8). Through this enactment Congress sought to reduce bankruptcy defaults, and thereby advance the

---

[5]  The only payments towards any of the Debtor's student loans were involuntary payments of \$39 per week that ECMC obtained by garnishing the Debtor's wages from September, 2006 to January, 2007.

6

original purposes of the student loan programs, *i.e.* to assure that students attending college would have reasonable access to low interest rate loans. *See* S.Rep. No. 673, 89th Cong., 1st Sess. (1965). Congress' broad purpose was "to keep our student loan programs intact," *In re Karen*, 201 BR. 681, 684 (Bankr. S.D.N.Y. 1996) (*quoting* remarks of *Representative Aortal*, 124 Cong. Rec. 1791-92), thereby benefitting future students whose education would not be possible without a "continued recycling of funds." *Id.* at 684.

## A. The Burden of Proof

As a preliminary matter the Court notes that the burden of proof on the issue of *undue hardship* is on the Debtor. *In re Stein*, *supra*, 218 BR. 281, 286-87 (Bankr. D. Conn. 1998). The standard of proof is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654 (1991).

## B. Analysis of Undue Hardship under Section 523(a)(8)(B).

### 1. The *Brunner* standards.

In the Second Circuit the existence of *undue hardship* must be determined according to the three-part test announced in *Brunner v. New York State Higher Education Services Corp,* 831 F.2d 395 (1987). To establish the dischargeability of his student loans, the Debtor must satisfy each prong of the *Brunner* test. *Stein*, *supra*, 218 B.R. at 287. According to *Brunner*, in order to prove *undue hardship*, a debtor must show by a preponderance of the evidence that:

> 1) the debtor cannot maintain, based on current income and expenses, a minimal standard of living for [him]self and [his] dependents if forced to repay the loans;
>
> 2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and

7

3) the debtor has made good faith efforts to repay the loans.

*Brunner, supra*, 831 F.2d at 396.

### a. Maintenance of minimal standard of living.

The first element of *Brunner* requires a showing that the Debtor "cannot maintain, based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans." This minimal standard of living test "requires more than a showing of tight finances," *Pennsylvania Higher Education Assistance Agency v. Faish*, 72 F.3d 298, 306 (3rd Cir.1995), and is not met "merely because repayment of the borrowed funds would require some major personal and financial sacrifices." *Id.* On the other hand, the Debtor "need not live in abject poverty before a discharge is forthcoming." *Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 438 (6th Cir. 1998).

"Distilled to its essence, this test requires the Court to examine the Debtor's current income and expenses and determine a flexible minimal standard of living level sensitive to the particular circumstances of each case through the application of common sense." *In re Stein, supra*, 218 BR. at 287.

### b. Circumstances indicating persistence of condition.

If the Court finds a sub-minimal standard of living, it must then assess the likely persistence of that state of affairs. This second prong of the *Brunner* test focuses on the clear Congressional intent behind Section 523(a)(8) - to make the discharge of student loans much more difficult than that of other non-excepted debt. *Brunner, supra*, 831 F.2d at 396. Requiring "additional circumstances ... indicating that this state of affairs [inability

8

to maintain a minimal standard of living] is likely to persist for a significant portion of the repayment period more reliably guarantees that the hardship presented is 'undue.'" *Id.*

If the debtor is un- or under-employed, then the Court must assess the debtor's future prospects for employment. In the case of student debtors, that assessment legitimately recognizes the very real and *continuing* benefit of the education acquired through the loan. Therefore, courts properly consider whether debtors have obtained and are using the substantial, continuing benefits of an education funded by taxpayer dollars as they intended and anticipated when they took out the loan. *See Pennsylvania Higher Education Assistance Agency v. Faish*, *supra*, 72 F.3d at 298, 306.

Circumstances impacting a debtor's inability to maintain a minimal standard of living over the balance of the repayment period include those where the debtor experienced an illness, developed a disability, or became responsible for a large number of dependents after receiving the student loan." *Congdon v. Educational Credit Management Corp. (In re Congdon)*, 365 B.R. 433, 437 (Bankr. D.Vt. 2007). Ultimately, the most important factor in satisfying the second prong is that the 'additional circumstances' must be beyond the debtor's control, not borne of free choice." *Barrett v. Educational Credit Management Corp. (In re Barrett)*,487 F.3d 353, 359 (6th Cir. 2007) (citation and quotation marks omitted).

### c. Good faith effort.

The third prong of the *Brunner* analysis - whether the debtor has made a *good faith* effort to repay his loan - is measured by a debtor's efforts to obtain employment, maximize income, and minimize expenses and encompasses a notion that the debtor may not

9

willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." *Educational Credit Management Corp. v. O'Hearn (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003) (citations and internal quotation marks omitted). Upon receiving the taxpayer-guaranteed loan and consequent educational benefit, a debtor assumes an obligation to make a *good faith* attempt at full repayment measured under the standards set forth above and must undertake all other reasonable efforts to insure repayment. *See Brunner, supra*, 831 F.2d at 397.

### 2. Application of the *Brunner* test to the Debtor.

Against this background of legal authority the Court now turns to analyze the factual circumstances presented by the Debtor in this case.

### a. Maintenance of minimal standard of living.

The Defendants have offered the Debtor the option of consolidating his student loans under the William D. Ford Program and making payments under the Income Contingent Repayment Plan (hereafter, "ICRP"), whereby payments are limited to approximately 20% of the excess of the Debtor's income over the poverty level and any remaining loan balance is forgiven after 25 years. Consideration of the monthly payment amounts under the ICRP option is appropriate under the *Brunner* standards. *See, e.g., DeRose v. EFG Technologies (In re DeRose)*, 316 B.R. 606, 609 (Bankr. W.D.N.Y. 2004). On the basis of the Debtor's present income, the monthly payment that would be due under the ICRP is $124.88.[6] The Debtor's current Monthly Cushion of $170.47 is sufficient to allow him to make the ICRP payment while continuing to maintain his present standard

---

[6]*See* ECMC Post-Trial Brief, p.2, fn. 2, Doc. I. D. No. 35.

10

of living.[7]

Nevertheless, the Debtor's monthly income coupled with his monthly budget reflects an individual barely surviving. The Debtor's budget is by no means excessive, and contains no frivolous or unnecessary expenses. The Debtor's monthly expenses, individually (*e.g.*, rent of $380.00) or totally ($951.00), are well below amounts scheduled by the vast majority of debtors, providing him with only the barest of essentials. His weekly food budget, amounting to $53.48[8], reflected by his diet, is pitiful. Of additional significance is the absence in his listed expenses of any provision for payment toward his much-needed dental care. While a debtor need not live in pathetic poverty to qualify for a discharge under *Brunner's* first prong, the Debtor does.

While the terms of his ICRP payment options may afford him opportunity to continue his *present standard of living*, the Court views that standard to be sub-minimal.[9] Accordingly, as the Debtor does not currently enjoy, and, therefore cannot maintain, *based on current income and expenses*, a minimal standard of living for himself, he has satisfied the first prong of the Brunner three part test.

---

[7] Although the Debtor is presently age 57, his age is not an obstacle under the ICRP, since such payments would be reduced, possibly to $0.00, if the Debtor's income declined due to retirement. *See, e.g. In re DeRose, supra*, 316 B.R. at 609.

[8]$230 per month divided by 4.3 = $53.48 per week.

[9] The Court is fully cognizant of the fact that the Debtor's present sub-standard living level is the consequence of his own free choice to squander his taxpayer provided college education, and his free time during weekdays. However, as discussed hereafter, his choice to do so is a significant factor in assessing his burden under both remaining prongs of *Brunner*, and, indeed, is fatal to his request for a determination of dischargeability.

11

### b. Additional circumstances indicating persistence of condition.

To satisfy the second prong of *Brunner*, the Debtor must establish that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period." *Brunner*, *supra*, 831 F.2d at 396. Here another and critical component enters the *Brunner* calculus. There is no question that the Debtor has been un- or under-employed continuously since 1974. However, the Debtor's employment history, while lamentable, and his living conditions, while sub-minimal and pitiful, are hardly the result of circumstances outside of his control as contemplated under the *Brunner* standards. Throughout his lifetime, the Debtor has habitually failed to cooperate with and repeatedly antagonized his supervisors and coworkers. Such conflicts led to his termination from the family business, the paramedic program at Capital, the Peace Corps, and one of the air cargo companies, as well as his inability to obtain additional hours at his present job. Between 1986 and 1993 the Debtor did little other than burn away a substantial inheritance. Moreover, the Debtor has snubbed his obligation to recognize and utilize his taxpayer funded college education. His efforts to find alternative and/or additional employment have been minimal at best, consisting almost entirely of posting a resume on a few internet job listing sites.

The Debtor's potential and his prospects for the future are bright and hindered only by his propensity for indolence, and his free choice to completely ignore his taxpayer financed college education. The Debtor has no dependents, and suffers no physical or

12

psychological impairment or disability[10] that would impede his ability to perform additional or more lucrative work.

The Court finds that, even though the Debtor's present circumstances have satisfied the first prong of the *Brunner* test, he has not met his burden of proving the existence of additional circumstances, beyond his control, that would satisfy the second prong. Indeed, the circumstances suggest the opposite – that his financial condition measured by disposable income can easily improve and that his potential for future more lucrative employment is positive. It is transparently obvious that the Debtor can readily use his college education, and alter his belligerent and antagonistic attitude, but simply chooses not to.

The Debtor has failed to demonstrate any "additional circumstances" *beyond his control, and not borne of free choice* indicating that his present state of affairs is likely to persist for a significant portion of the repayment period. Having thus failed to satisfy *Brunner's* second prong, he is not entitled to discharge his educational loan indebtedness to the Defendants.

## c. *Good faith*.

Finally, even if the Debtor had satisfied the second prong of the *Brunner* test, he has failed to provide any evidence of good faith efforts towards repayment of his student loans. And, as noted by the District Court in *Brunner*, it is the Debtor's burden to establish that "the forces preventing repayment are *truly beyond his . . . reasonable control." Brunner*, 46 BR. 752, 756 (S.D.N.Y. 1985) (emphasis added).

---

[10]The Debtor presented no evidence to suggest the existence of a physical or psychological impairment relevant to his ability to seek, obtain and maintain full time employment.

13

The Debtor's employment history, replete with examples of attitude and behavior undermining opportunities to maximize income, even to the extent of preventing him from working additional hours at his present employment, is relevant in assessing the third prong as well. Good faith is measured by a debtor's "efforts to obtain employment, maximize income, and minimize expenses . . . and to undertake all other reasonable efforts to insure repayment." *Stein, supra*, 218 B.R. at 288 (internal quotation marks and citations omitted); *O'Hearn, supra*, 339 F.3d at 564.

The Debtor's employment record reveals a complete failure to pursue a career commensurate with his college education and a striking indifference toward maintaining steady employment. He has made no effort to find additional employment to supplement his current income.[11] He works only on weekends and he has not requested additional hours from his present employer in the past year. Meanwhile, he has nothing to do throughout most of the week and even complains of boredom.[12] It is not an undue hardship to require an able debtor to work a full time job. *See Brightful v. Pennsylvania Higher Educ. Assistance Agency (In re Brightful)*, 267 F.3d 324, 329 (3rd Cir. 2001) (holding that a debtor has an obligation to pursue other opportunities if unable to earn enough in his or her current job); *Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 325 (4th Cir. 2008) (holding that it is not an undue hardship for a teacher to work a full calendar year);

---

[11] The Debtor could very easily improve his circumstances by obtaining part-time employment in addition to his current employment. He currently works only on weekends – between the hours of 5:00pm Friday to 11:00pm Sunday. Other than six (6) or seven (7) hours per week reviewing ancient literature, the Debtor testified he doesn't do much, if anything. The Debtor has both the time and the ability to work additional hours, and doing so would enable him to alter positively and dramatically his current financial circumstances.

[12] While the debtor acknowledges his ability to work 40 hours per week or more, he admits to not using his substantial free time to search for other employment.

14

*Heam*, *supra*, 339 F.3d at 566 ("[i]t is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans."). The Debtor has undertaken no effort to maximize his income and, on this basis alone, has not satisfied *Brunner's* good faith prong.

In addition, the Debtor has never made a single voluntary payment on his student loan obligations. Because the Debtor, by exercise of free choice, has failed to (i) take any step to increase his income, yet could easily do so, (ii) make even nominal payments towards his student loans, and (iii) pursue affordable repayment options available to him through the ICRP program, he has not satisfied the good faith requisite of *Brunner*.

## VI.    CONCLUSION

In accordance with the forgoing discussion, this Court finds that the entire amount of the Debtor's educational loan debt to the Defendants is nondischargeable pursuant to 11 U.S.C. § 523(a)(8)(B). A separate Judgment consistent with this Memorandum of Decision shall issue this same date.

Dated: October 8, 2009                                BY THE COURT

                                                Albert S. Dabrowski
                                                Chief United States Bankruptcy Judge

15

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

IN RE:                                          )
                                                )
THOMAS VAUGHAN RHODES,                           )       CASE NO.  07-21721 (ASD)
                                                )
_____DEBTOR_____            )       CHAPTER  7
                                                )
THOMAS VAUGHAN RHODES,                            )
                                                )
            PLAINTIFF                            )
                                                )
v.                                              )       ADV. PRO. NO. 08-2016
                                                )
CONNECTICUT STUDENT LOAN                          )       Re: DOC. I.D. NO. 1
FOUNDATION and EDUCATIONAL                        )
CREDIT MANAGEMENT CORP.,                          )
                                                )
            DEFENDANTS                           )_____

## JUDGMENT

This adversary proceeding having come on for trial before this Court; and the Court

having received and reviewed the evidence, and having received and considered

arguments of the parties thereon; and having this day issued its Memorandum of Decision

on Complaint to Determine Dischargeability of Educational Debt, in accordance with which

**IT IS HEREBY ORDERED** that judgment shall enter in this adversary proceeding

in favor of the Defendants. The Debtor-Plaintiff's educational loan debt to the Defendants,

as described in the Complaint, is **nondischargeable** pursuant to Section 523(a)(8).

Dated: October 8, 2009                                  BY THE COURT

                                                        Albert S. Dabrowski
                                                        Chief United States Bankruptcy Judge